# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| **DEBRA LASKA,**<br><br>　　Plaintiff,<br><br>v.<br><br>**KELLEY MANUFACTURING CO. d/b/a KMC MANUFACTURING COMPANY,**<br><br>　　Defendant. | Civil Action No. 7:17-CV-214 (HL) |

## ORDER

Plaintiff Debra Laska worked for Defendant Kelley Manufacturing Co. d/b/a KMC Manufacturing Company ("Kelley Manufacturing Co." or "KMC") for approximately seven years. During the last six months or so of Plaintiff's employment, Defendant hired Plaintiff's husband James Laska as the Vice President of Sales and Marketing. Both Plaintiff and her husband were suspended by Defendant on July 24, 2017 and terminated on August 7, 2017. In a separate lawsuit filed in this Court, James Laska v. Kelley Manufacturing Co. d/b/a KMC Manufacturing Company, Case No. 7:17-CV-212, James Laska alleged that Defendant terminated his employment in retaliation for opposing unlawful employment practices in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). In this case, Plaintiff contends that

she, too, was terminated in retaliation for her husband engaging in statutorily protected conduct.

Now before the Court is Defendant's Motion for Summary Judgment (Doc. 28). After reviewing the pleadings, briefs, depositions, and other evidentiary materials presented, the Court concludes that there is no genuine dispute of the material facts and finds that Defendant is entitled to judgment as a matter of law.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Kelly Manufacturing Co. hired Plaintiff as a receptionist and switchboard operator on November 8, 2010. (D. Laska Dep., p. 70). Plaintiff worked in that position for approximately three years before she became the Human Resources ("HR") Assistant. (Id.). After working in that position for about two years, the HR Director under whom she worked retired, and Plaintiff was promoted to HR Director. (Id. at p. 72). Plaintiff was also a member of KMC's Board of Directors. (Doc. 1, ¶ 9).

Toward the end of 2016, KMC's long-time Vice President of Sales and Marketing announced his retirement. (Laska Dep., p. 107). As the company began its search for a replacement, Plaintiff discussed with Lanier Carson,

---

[1] With the exception of the facts relating specifically to Plaintiff and her position at KMC, the facts outlined herein are the same as those set forth by the Court in its Order granting Defendant's Motion for Summary Judgment in the companion case, James Laska v. Kelley Manufacturing Co. d/b/a KMC Manufacturing Company, Case No. 7:17-CV-212. (Doc. 37).

KMC's Chief Executive Officer ("CEO"), the possibility of her husband James Laska applying for the position. (Id.). Laska submitted his resumé in December 2016. (Id. at p. 108). On January 5, 2017, KMC extended a formal written offer to Laska. (Doc. 28-11, p. 29). Per the terms of the offer, Laska would be hired as the Director of Sales and Marketing. (Id.). Additionally, after an opportunity to acclimate to the equipment and culture of the business, KMC would promote Laska to Vice President of Sales and Marketing and offer him a seat on the Board of Directors. (Id.). Laska accepted the terms of employment on January 9, 2017, and began working for KMC on February 1, 2017. (Doc. 28-11, p. 30). Laska's title changed from Director to Vice President some time shortly thereafter. (Laska Dep., p. 120; Carson Dep., p. 35).

As the Vice President of Sales and Marketing, Laska was accountable for a number of responsibilities. (Doc. 28-11, p. 31). He coordinated and managed the activities of KMC's Territory Managers, Field Service Representatives, Distributers, and Advertising Manager. (Id.). He was responsible for determining staffing needs, including the hiring and firing of new personnel, with the approval of the company's President. (Id.). Additionally, Laska's job entailed developing, editing, and publishing price lists and updates; disseminating marketing and sales information; accounting for lost sales; monitoring margins on all products;

providing adequate and timely availability of finished goods; and other related tasks. (Id.).

Kelly Peele, who first began working for KMC as the Advertising Manager in 2011, resigned her position on June 30, 2017. (Peele Dep., p. 7-8; Laska Dep., p. 184). Prior to her resignation, Peele received an e-mail from a woman named Erica Thrift, who worked for Black Crow Media. (Peele Dep., p. 46-47; Doc. 28-5, p. 86-87, 89). Thrift expressed an interest in meeting with Peele to discuss potential advertising opportunities. (Id.). Peele scheduled a meeting with Thrift but resigned prior to the meeting taking place. (Id. p. 48-49; Laska Dep., p. 214).

About a week following Peele's resignation, Thrift contacted Laska and asked if he would keep the appointment Thrift previously scheduled with Peele. (Laska Dep., p. 214). Thrift also inquired whether KMC intended to fill the Advertising Manager position. (Id.). Laska set an appointment with Thrift for July 10, 2017 at 10:00 a.m. (Id.). He met with Thrift and another male salesperson from Black Crow Media on July 10 to discuss agriculture-related advertising programs. (Id. at p. 215, 217). At the conclusion of the meeting, Thrift again asked about the Advertising Manager position. (Id. at p. 218). Laska suggested that Thrift e-mail her resumé. (Id.).

Thrift e-mailed Laska at 10:33 a.m. on July 10, once more expressing an interest in the marketing position and asking whether she could send him her

resumé. (Doc. 28-11, p. 63). Laska responded to Thrift at 11:19 a.m., directing her to send her resumé to Plaintiff in Human Resources. (Id.). Thrift then e-mailed Plaintiff at 2:54 p.m. (Id. at p. 64-67). Plaintiff testified that after receiving Thrift's resumé, she provided a copy to her husband. (D. Laska Dep., p. 158). She also printed a copy and placed it in Lanier Carson's box, along with numerous other resumés for various positions open throughout the company. (Id. at p. 158-160).

In later correspondence with the Department of Labor, Laska described Thrift's physical appearance on the day of their meeting in great detail:

> I must admit that when I turned the corner I was a bit surprised as I was greeted by an attractive dark tanned tall brunette in very fit condition wearing a snakeskin print pair of pants and very revealing tight black sleeveless shirt exposing quite a bit of cleavage. I also noticed there was a script tattoo on her left shoulder and arm that read "love me for who I am" and some other tattoo on her right arm. My first thought was this did not appear to be appropriate business wear for a woman to be calling on advertising clients.

(Doc. 28-7, p. 82; Laska Dep., p. 216-217).

Laska provided a similar description to Rhonda Pearman, Lanier Carson's Executive Administrative Assistant, immediately after his meeting with Thrift. (Laska Dep., p. 200; Pearman Dep., p. 30-31). On the way back to his office, Laska stopped by Pearman's office and engaged in the following interchange:

> I asked her, I said, "Did you happen to see that lady and man that just came by here with me?" And she said no. I said, "Yeah,

5

well," I said, "in my opinion she wasn't dressed correctly for a business engagement or business meeting."

And she said, "Well, what do you mean by that?"

And I explained what I just did, a tube top, you know, she was a very fit, attractive young lady, very bosomy, and she had on this small tube top with the tattoos. Rhonda immediately blurted out, "What a whore."

(Laska Dep., p. 220).

Laska testified that he promptly chastised Pearman, saying, "Rhonda, you cannot call people whore. You don't know anything about this woman." (Id. at p. 220-221). He further stated, "Now, she might have been just a visitor when she came in, but now she's a job applicant." (Id.).[2] Pearman responded, "Well, I'm telling you right now the old man [Carson] ain't going to never let no bombshell like that work up in here." (Id.). Laska then reiterated, "You can't discriminate against this woman, and you can't prejudge her. . . . She's got two kids, she's struggling to make ends meet. And, you know, just because she looks different from other people, you can't discriminate." (Id.). Pearman then told Laska to "[g]et the F out of my office now." (Id.).

Throughout the afternoon of July 10, Laska recounted his experience with Thrift and Pearman's reaction with employees in both the customer service

---

[2] Laska admits that at the time of this conversation, Thrift had expressed interest in the open position but had not yet provided her resumé. (Laska Dep., p. 222-223).

6

department and the international sales department. (Id. at p. 225). While Laska denies the allegation that when relaying his encounter with Thrift he referred to her as a "bombshell" and gestured with his hands to describe Thrift's physical features, he admits that he described her attire in detail and referred to her as being "fit, very attractive, [and having] dark skin." (Id. at p. 225-227). Laska also admits that he repeated Pearman's reference to Thrift as a "whore." (Id. at p. 225).

Jimmy Tomberlin, KMC's Chief Financial Officer ("CFO"), testified that Plaintiff also relayed the incident to him. (Tomberlin Dep., p. 29). According to Tomberlin, Plaintiff came to his office and "described exactly what she was wearing. I remember he said she had on this fantastic leopard-skinned something, pants or outfit or something, tattoos in various places, very well-endowed, and was really – seemed excited to tell me about it." (Id.).

Laska had a meeting with KMC's President, Bennie Branch, and Charles Sumner on July 10 as well. At the conclusion of the meeting, Laska asked the two gentlemen if they had seen the "bombshell" in his office that morning. (Branch Aff., ¶ 6). Branch thought perhaps Laska was referring to a large equipment order, but then Laska began describing the "well endowed," "very, very, very well built" female visitor. (Id.). Branch testified that he was embarrassed by Laska's comments. (Branch Dep., p. 62). Because the door to

Branch's office was open, and because Laska was speaking so loudly, Branch was also concerned that Rhonda Pearman, whose office was next door, may be embarrassed by Laska's remarks as well. (Id.). Branch approached Pearman after the meeting and asked whether she heard Laska's comments. (Id. at p. 60). Pearman responded "that he had already been up and down the hall that morning saying the same things to other people." (Id. at p. 60-61).

Branch wrote a statement concerning the interaction on July 10, 2017. (Id. at p. 59-60). He felt as though the situation was serious enough that he "wanted to make sure that the details were . . . accurate." (Id. at p. 62). Branch also called Lanier Carson, who was not in the office at the time,[3] to report the conversation with Laska. (Id. at p. 63; Carson Dep., p. 49). Carson said that he would handle it. (Id.). Carson testified that after receiving the call from Branch, he was concerned because "[o]ur company doesn't have a reputation of having people dress like [Laska] had described to Mr. Branch." (Carson Dep., p. 51).[4] Carson

---

[3] July 10, 2017, fell on a Monday, and Carson only worked in the office Wednesday through Friday. (Laska Dep., p. 220). At the time these particular events transpired, Carson was on St. Simons Island. (Carson Dep., p. 50).

[4] KMC's Management Guide, with which Laska would have been familiar as a member of management, sets out conservative guidelines for employee dress: "It is important for KMC employees to present a professional image to customers and visitors. . . . During business hours, female employees shall not be permitted to wear mini-skirts, leggings, tank tops, blue jeans, shorts or dresses above the knee. Skirts below the knee with modest splits will be acceptable. Men will not be permitted to wear blue jeans, tee shirts, tank tops, or shorts. Men are required to wear socks and shirttails must be tucked inside pants." (Doc. 28-5, p. 65).

then contacted Rhonda Pearman to ask whether she had heard anything about the woman from Black Crow Media. (Id.). She responded affirmatively. (Id.; Pearman Dep., p. 36-37).

The next day, July 11, 2017, Carson directed Pearman to send an e-mail to Laska, Jimmy Tomberlin, and Bennie Branch, with the subject line "Visitor from Black Crow Media." (Carson Dep., p. 52; Pearman Dep., p. 37-38; Doc. 28-11, p. 68). He then dictated the following message, which was transmitted to the intended recipients at 1:42 p.m.:[5]

> I have received multiple calls about the "bombshell" that came into the office yesterday (from Black Crow Media). **Under no circumstances** do we need to make a commitment to someone like this for advertising or whatever her reason for being at KMC! I will schedule a meeting tomorrow to discuss this matter.

(Doc. 28-11, p. 68) (emphasis in original). Upon receiving the e-mail, Laska confronted Pearman, demanding to know who made the multiple calls to Carson. (Laska Dep., p. 234). Pearman denied contacting Carson and again told Plaintiff to "[g]et the F out." (Id. at p. 241). Laska also approached Bennie Branch about the e-mail on the afternoon of July 11. Branch wrote a contemporaneous statement documenting the conversation:

> He asked if I had seen her. I said I had not. He said no one other than he had seen her, so the emails must have been stirred up by

---

[5] It was standard practice for Carson to dictate e-mails for Pearman to send on his behalf from her company e-mail address. (Pearman Dep., p. 28). He reviewed the content of the e-mails prior to them being sent. (Id.).

the, quote, large woman, end quote, up front. He said, quote, that is discrimination, period, end quote. He states he, quote, did not agree with that, period, end quote.

(Branch Dep., p. 65). Branch believed Laska to be referring to Pearman as the "large woman up front." (Id. at p. 66). Branch testified that was the first time he heard Plaintiff use the term "discrimination." (Id.). Yet Laska "did not elaborate on who was being discriminated against and why." (Id. at p. 69). From Branch's perspective, "if there was any discrimination going on, it was [Laska's] actions toward this woman, not that – not that there was any discrimination on Ms. Pearman's part." (Id. at p. 70).

Following the Board meeting on the morning of July 12, 2017, Carson requested that Laska, Branch, and Tomberlin stay after the meeting. (Laska Dep., p. 244; Carson Dep., p. 53; Branch Dep., p. 73). Carson then asked Laska about his involvement with Erica Thrift:

> Now, [Carson] asked me directly, "Did you set up the appointment with this woman originally to, you know, do business?"
>
> And I said, "No, sir."
>
> And he paused, and he said, "Did you contract to do any business with her?"
>
> And I said, "No, sir."
>
> And he says, "Well," he says, "I'm going to tell you right now, we don't need white trash like that running around this building up here."

10

>And I said, "Well, okay."
>
>And I did not want to get in a confrontation with him, so I had nothing to say, literally nothing to say at that point.

(Laksa Dep., p. 244-245). According to Laska the last comment Carson made was something along the lines of "Well, she's like a whore of Babylon, is what I understand." (Id. at p. 245). Nothing more was said. (Id.).

Later that same afternoon, Laska met with Carson individually. (Id.; Carson Dep., p. 54-55). Carson stated that Pearman mentioned that Laska was still mad at Pearman about the situation. (Id.). Laska denied being mad and remarked, "I'm simply trying to save the company from being put in a liable situation where we could be sued for discrimination." (Id. at p. 246). To which Carson retorted, "Who the hell made you an attorney?" (Id.). Laska replied, "I don't have my law degree, Mr. Carson, but the fact is that email was discriminatory since that woman is a job applicant." (Id.). Carson then said, "I'm done with you. Get out." (Id.).

Laska testified that after this conversation with Carson, neither he nor Plaintiff ever had access to Carson or Pearman again. (Id.). They were locked out of meetings and denied appointments. (Id. at p. 247-248). Laska stated, "I was pretty much blackballed at that point. I knew what was going on." (Id. at p. 248). Plaintiff and her husband left on July 19, 2017, to attend a trade show as representatives of KMC in San Destin, Florida. (Id. at p. 145). On July 21, 2017,

11

Laska received a series of e-mails documenting alleged errors he had made. (Id. at p. 301-308). Laska believed that the e-mails were a part of "the witch-hunt to find something wrong." (Id. at p. 306).

Both Plaintiff and her husband were suspended with pay upon returning from their business trip on July 24, 2017. (D. Laska Dep., p. 171). They were told that once they were removed from the Board of Directors that they would be terminated. (Id. at p. 172). They were not notified of a specific reason for their termination. (Id.). Carson said only that they had violated company policy. (Id.).

KMC provided the following reasons for terminating Plaintiff to the Department of Labor:

> The Company is concerned that Mrs. Laska will not be able to effectively serve as human resources director following the termination of her husband Jimmy Laska's employment with the Company. The Company also has concerns that Mrs. Laska has supported some of her husband's unprofessional and inappropriate conduct towards employees of the Company by among other things, participating in issuing reprimands to employees at his direction. Mrs. Laska has also failed to follow instructions from her supervisor to wear closed shoes on the factory floor. This insubordination is significant because as human resources director, she is responsible for setting a good example for the employees and seeing that other employees comply with the Company's safety policies and other polices.

(Doc. 28-5, p. 106).

Plaintiff filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 3, 2017. (Doc. 28-5, p. 95). Plaintiff

and her husband were terminated effective August 7, 2017. (Laska Dep., p. 319). Plaintiff filed a second Charge of Discrimination on September 15, 2017. (Doc. 28-7, p. 115). The EEOC issued Plaintiff a Notice of Suit Rights on November 21, 2017, and this lawsuit followed on December 21, 2017. (Doc. 1; Doc. 1-2, p. 2).

## II. SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the

burden shifts to the party opposing summary judgment to go beyond the pleadings and to present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). But, when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

Plaintiff's sole claim is that Defendant terminated her employment in retaliation for her husband reporting that Defendant allegedly discriminated against Erica Thrift. (Doc. 1, ¶ 13).[6] Defendant argues that summary judgment is

---

[6] In her Complaint, Plaintiff alleges that she filed her initial charge of retaliation with the EEOC on August 3, 2017; that she notified Defendant's attorney of the charge that same evening; and that she was terminated on August 7, 2017. (Doc. 1, ¶ 7). Plaintiff has not, however, affirmatively stated a claim for relief under the "participation clause" of Title VII's anti-retaliation provision nor has she provided any evidence that Defendant retaliated against her for filing a charge of discrimination. See 42 U.S.C. § 2000e-3(a); Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn., 555 U.S. 271, 274 (2009) (explaining that Title VII's anti-retaliation provision sets forth two clauses, the "opposition clause" and the "participation clause"). Plaintiff also failed to respond to Defendant's argument that she is unable to establish a prima facie case of discrimination under the participation clause. Accordingly, to the extent that Plaintiff intended to set forth a claim under the participation clause, the claim is deemed abandoned. See Coal.

14

proper because Plaintiff cannot establish that her husband participated in a statutorily protected activity.

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, the plaintiff must demonstrate that she (1) participated in statutorily protected activity; (2) suffered a materially adverse employment action; and (3) that there is a causal connection between the two. Evans v. Books-A-Million, 762 F.3d 1288, 1298 (11th Cir. 2014).

Only a "person aggrieved" may recover under Title VII. 42 U.S.C. § 2000e-5(b), (f)(1). The Supreme Court has held that Title VII's anti-retaliation provision prohibits any action by an employer that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," meaning that the statute potentially can protect a third party from reprisal. Burlington N. & S.F.R. Co. v. White, 548 U.S. 53, 68 (2006). Where, as here, a plaintiff contends that she suffered an adverse employment action because of

---

for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000) ("[F]ailure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

her association with another employee who engaged in statutorily protected conduct, to recover under Title VII the plaintiff first must demonstrate that she falls within the "zone of interests" in order to receive the protection of Title VII. See Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 178 (2011) (holding that the term "aggrieved" in Title VII incorporates the "zone of interests" test and enables suit by a plaintiff whose interests are arguably protected by the statute). The "zone of interests" test denies a right of review "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Id. (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399-400 (1987)).

The parties do not dispute that Plaintiff falls within the "zone of interests" as the spouse of the person alleged to have engaged in protected conduct. Nevertheless, Plaintiff's claim fails because she cannot demonstrate that her husband opposed any unlawful employment practice by Defendant. In its Order granting Defendant's motion for summary judgment in the companion case, James Laska v. Kelley Manufacturing Co. d/b/a KMC Manufacturing Company, Case No. 7:17-CV-212, Doc. 37, the Court thoroughly analyzed James Laska's allegations against Defendant and concluded that Laska failed to meet his burden of establishing that his objection to any allegedly discriminatory conduct by Defendant was objectively reasonable. Little v. United Tech., Carrier

Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997) (emphasis in original). The Court alternatively concluded that any report of discrimination Plaintiff might have voiced to Defendant fell squarely within the "manager rule" and, therefore, did not qualify as protected conduct under Title VII.

In the absence of a valid claim of retaliation by her husband, Plaintiff has no basis for recovery under Title VII's anti-retaliation provision. Defendant accordingly is entitled to summary judgment.

## IV.  Conclusion

For the reasons discussed herein, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 28). This case is hereby dismissed with prejudice.

**SO ORDERED**, this the 26th day of September, 2019.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks